IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

SPACECON SPECIALTY CONTRACTORS, LLC,

    Plaintiff,

v.

RICHARD BENSINGER, an individual

    Defendant.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Spacecon Specialty Contractors, LLC ("SSC"), by and through its attorneys Lawrence W. Marquess and Michelle S. Simmons of Littler Mendelson, P.C., states the following Complaint against Defendant Richard Bensinger ("Mr. Bensinger"). This Complaint alleges that Mr. Bensinger produced and directed and then published an audio/video film which defames SSC in SSC's trade and business and attributes criminal actions to SSC and prays for an award of damages and costs and for injunctive relief to prohibit the further showing, distribution or other publication of the defamatory content of the film.

## I.
## PARTIES

1.    SSC is a Delaware limited liability company with its headquarters and principal place of business in Colorado Springs, Colorado.

2\. SSC is a construction contractor providing drywall installation, interior and exterior metal stud framing, acoustic ceilings, carpentry services, and other related interior finish services in public and private commercial construction, primarily in the State of Colorado.

3. Mr. Bensinger is an individual who resides in McLean, Virginia. He is a co-founder of and a partner in a business entitled the Institute For Employee Choice, which is headquartered in McLean, Virginia.

## II.
## JURISDICTION AND VENUE

4. SSC is a citizen of Delaware and Colorado pursuant to 28 U.S.C. § 1332(c)(1).

5. Mr. Bensinger is a citizen of the State of Virginia for purposes of 28 U.S.C. § 1332.

6. Plaintiff is seeking damages in excess of $75,000.00 exclusive of interest and costs against Mr. Bensinger.

7. Accordingly, this Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

8. This Court has personal jurisdiction over Mr. Bensinger pursuant to Colorado's long arm statute, C.R.S. § 13-1-124, because Mr. Bensinger traveled into the State of Colorado where he committed the tortious acts against SSC which are the subject of this complaint.

9. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events giving rise to the claim occurred in

Colorado.

## III.
## FACTS

10. In and about 2008 and early 2009, Mr. Bensinger directed and produced a video or film entitled *Looking The Other Way: Benefiting From Misery* ("Film").

11. Mr. Bensinger was personally responsible for and participated in developing the story-line and message of the Film.

12. Mr. Bensinger was personally responsible for and participated in selecting individuals to appear in the Film and worked with most of the individuals who appear and speak in the Film to prepare and give their statements in the Film.

13. Mr. Bensinger was personally responsible for and participated in the filming of the Film, which took place primarily in Colorado.

14. Mr. Bensinger was personally responsible for and participated in arranging for a demonstration by a number of individuals at or by the location of a construction project in downtown Denver, Colorado, on which SSC was a subcontractor, in which demonstration some of the participants carried signs bearing SSC's name and others signs bearing the legend "Stop Immigrant Abuse." Mr. Bensinger then directed the filming of the demonstration for the Film.

15. Mr. Bensinger is responsible for the content and the message of the Film.

16. In approximately March 2009, invitations to a screening of the Film were widely distributed to members of the public in Colorado, including but not limited to government officials ultimately responsible for oversight of government construction work, owners of construction projects, executives and managers of general construction

companies to which SSC bids for work, and others whose perception of SSC and its reputation for honest, lawful and ethical business practices could have a significant impact on SSC's business.

17. The invitations were for a screening of the Film on March 12, 2009, at the Starz FilmCenter at the Tivoli in the Tivoli Student Union of the Auraria Higher Education Center on the Auraria campus in Denver, Colorado.

18. The invitation stated that this was a "pre-release screening of the documentary film" to be followed by a panel discussion. Mr. Bensinger was included among the panelists.

19. No fee was charged for attending the showing of the Film.

20. A poster was created and posted in public areas which contained photographs of scenes from the Film, including a scene of the demonstrators described in Paragraph 14 *supra*, clearly picturing a legible sign identifying SSC in close proximity in the photograph to a legible sign stating "Stop Immigrant Labor Abuse."

21. In describing the Film, the poster refers to human trafficking, tax evasion, and insurance fraud involving the exploitation of immigrant workers to the benefit of wealthy individuals and describes the film as "expos[ing] one Colorado construction firm and the devastating effects it's actions are having on the workers, honest competitors, taxpayers, and the Colorado construction industry as a whole."

22. The photograph on the poster effectively and intentionally identifies SSC as the "construction firm" described in the poster as engaging in the unethical and unlawful actions of human trafficking, tax evasion, and insurance fraud involving the

exploitation of immigrant workers.

23. On information and belief, Mr. Bensinger participated in the creation of the poster and approved its distribution and posting to the public.

24. The Film was shown by Mr. Bensinger on March 12, 2009, to an audience of the public, as described in Paragraph 16, *supra*, numbering over 50 individuals.

25. The Film used footage of Mexican immigrants, brought into the United States to work for two labor brokers who had contracted to provide labor on a project in Avon, Colorado for a drywall contractor unrelated to SSC, to portray immigrant workers who repeatedly described how they had been exploited and abused since being brought to the United States, including but not limited to descriptions of promises of employment, pay and benefits which they did not receive, of being paid in cash and without legally required payroll taxes being withheld or paid, and of inhumane living conditions. Throughout the Film, the message is conveyed that these individuals and the illegal and unethical actions described by them were attributable to SSC.

26. Individuals appear in the Film (a) to describe SSC as using illegitimate "labor brokers" to acquire the use of immigrant Mexican laborers in order to cut labor costs and (b) to convey the message that these immigrant Mexican laborers, brought to the United States to work for SSC, are subjected to the illegal and inhumane treatment described in Paragraph 25, *supra,* with SSC's knowledge and approval*..*

27. Individuals appear in the Film to state that SSC (a) misclassifies its employees as independent contractors in order to evade paying employment taxes and providing workers compensation insurance required by law and (b) abuses its

employees by overworking them.

28. The Film clearly conveys the message that SSC knowingly engages in all of the misconduct described in Paragraphs 25, 26, and 27, *supra,* as a routine and ongoing course of doing its business.

29. Mr. Bensinger made no effort to contact SSC or its representatives to investigate the truth of the statements about SSC and its labor practices made in the Film, while he was preparing the Film.

30. The statements and message about SSC made in the Film are untrue.

31. Less than 2 weeks before the Film was screened on March 12, 2009, Mr. Bensinger sent SSC a list of questions concerning SSC, some of which related to the content of the Film.

32. SSC answered the questions truthfully and delivered the answers to Mr. Bensinger before March 12, and those answers were such as to have put Mr. Bensinger on notice that the statements about SSC and its labor practices made in the Film were untrue. Nevertheless, Mr. Bensinger presented the Film including the false statements about SSC.

33. The publication of the false statements about SSC to the public and particularly to individuals in a position to impact SSC's business has damaged SSC's reputation as an honest and law-abiding business organization by widely communicating the clear but false message that SSC engages in unlawful, unethical and abusive employment practices.

34. Mr. Bensinger knew or should have known that the messages about SSC

employees by overworking them.

28. The Film clearly conveys the message that SSC knowingly engages in all of the misconduct described in Paragraphs 25, 26, and 27, *supra,* as a routine and ongoing course of doing its business.

29. Mr. Bensinger made no effort to contact SSC or its representatives to investigate the truth of the statements about SSC and its labor practices made in the Film, while he was preparing the Film.

30. The statements and message about SSC made in the Film are untrue.

31. Less than 2 weeks before the Film was screened on March 12, 2009, Mr. Bensinger sent SSC a list of questions concerning SSC, some of which related to the content of the Film.

32. SSC answered the questions truthfully and delivered the answers to Mr. Bensinger before March 12, and those answers were such as to have put Mr. Bensinger on notice that the statements about SSC and its labor practices made in the Film were untrue. Nevertheless, Mr. Bensinger presented the Film including the false statements about SSC.

33. The publication of the false statements about SSC to the public and particularly to individuals in a position to impact SSC's business has damaged SSC's reputation as an honest and law-abiding business organization by widely communicating the clear but false message that SSC engages in unlawful, unethical and abusive employment practices.

34. Mr. Bensinger knew or should have known that the messages about SSC

delivered in the Film and the advertising poster were untrue.

35.     Mr. Bensinger publicly announced at the March 12, 2009, showing of the Film that he intends to do additional filming in Colorado in spring 2009 for addition to the Film and that he intends to show the Film widely to the public in the fall of 2009. Subsequent communications from Mr. Bensinger have revised his filming schedule but confirm his intent to add to the Film and show it widely.  Nothing in these communications from Mr. Bensinger suggests any change in the Film's false message about SSC, nor has Mr. Bensinger made any effort to corroborate the information about SSC contained in his Film.

36.     On information and belief, the Film has been shown at times subsequent to March 12, 2009, to other groups and individuals with the knowledge and approval of Mr. Bensinger and with the intent to damage SSC's reputation.

## IV.
## CLAIM FOR RELIEF

### Defamation

37.     SSC re-alleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 36, inclusive, as though fully set forth herein.

38.     Mr. Bensinger published false and damaging statements about SSC when he screened the Film to a large audience in Denver on or about March 12, 2009.

39.     Mr. Bensinger published false and damaging statements about SSC when he participated in the distribution and posting of the poster in the public, advertising the screening of the Film during the weeks leading up to and on March 12, 2009.

40. The false and damaging statements about SSC in the Film have been published to third parties on additional occasions with the knowledge and approval of Mr. Bensinger.

41. The false and damaging statements about SSC in the Film published on March 12, 2009 and at other times and in the poster, attacked SSC's trade and business and constitute libel *per se*.

42. The false statements of fact contained in the film and poster are libel *per se* because they attribute to SSC the commission of crimes including tax evasion, insurance fraud, and human trafficking.

43. At the time Mr. Bensinger published the false statements of fact about SSC, he knew that the statements were false or acted with reckless disregard as to whether the statements were false.

44. Given Mr. Bensinger's public statement that he has more filming to do and that the completed film will be released in the Fall of 2009, SSC has reason to believe that Mr. Bensinger will continue publication of false statements of fact about SSC that constitute libel *per se*. Unless and until enjoined and restrained by order of this Court, Mr. Bensinger's actions will cause SSC great and irreparable injury in that SSC will continue to be wrongly accused of the commission of crimes and to be defamed in its trade or business.

45. As a result of Mr. Bensinger's conduct, SSC has suffered damages in excess of $75,000, the exact amount to be determined at trial.

46. Further, as a direct result of said statements, SSC has been and will in the

future be caused to suffer damage to its business reputation and has and will in the future be deprived of business associations.

47. The damages caused by Mr. Bensinger's film were reasonably foreseeable or normal consequences of producing and showing the film and posting the poster.

48. On information and belief, the defamatory statements made in Mr. Bensinger's film have been repeated by persons in attendance at the film pre-screening. On information and belief, such repetitions were authorized or intended by Mr. Bensinger, or were made under circumstances known to Mr. Bensinger at the time of the pre-screening which gave him reason to expect such repetition. Specifically, Mr. Bensinger purposefully invited SSC's business competitors, potential customers, and union representatives, all of whom Mr. Bensinger knew or should have known would have reason to repeat statements about SSC they heard in the film.

49. In publishing false statements against SSC, Mr. Bensinger has engaged in conduct that was fraudulent, malicious and/or willful and wanton and is therefore subject to punitive damages.

50. SSC is entitled to injunctive relief and to recover actual, special, consequential and punitive damages in an amount exceeding $75,000 as a result of Mr. Bensinger's publication of defamatory communications which constitute libel *per se*.

## V.
## PRAYER FOR RELIEF

WHEREFORE, SSC respectfully requests that the Court grant SSC the following relief:

1. Preliminary and permanent injunctive relief prohibiting Mr. Bensinger from further publication of the defamatory statements in Film;

2. Actual damages;

3. Special damages;

4. Consequential damages;

5. Punitive damages;

6. Pre- and post-judgment interest;

7. Attorneys' fees, costs and expenses;

8. Any other relief that this Court deems just and proper.

SSC demands actual, special, consequential and punitive damages in an amount as proven at trial and in any case, exceeding $75,000 in the aggregate.

## VI.
## JURY DEMAND

SSC requests a trial by jury on all issues so triable.

Dated August 31, 2009

                                  *s/ Lawrence W. Marquess*
Lawrence W. Marquess
Michelle S. Simmons
LITTLER MENDELSON
A Professional Corporation
1200 17th Street
Suite 1000
Denver, CO  80202.5835
Telephone:  303.629.6200

ATTORNEYS FOR PLAINTIFF
SPACECON SPECIALTY
CONTRACTORS, LLC

Firmwide:90929789.1 060035.1002