**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 09-cv-02080-REB-KLM

SPACECON SPECIALTY CONTRACTORS, LLC.

    Plaintiff,

v.

RICHARD BENSINGER, an individual

    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Blackburn, J.**

    This matter is before me on **Defendant Richard Bensinge's Motion for Summary Judgment** [#87][1] (public entry), [#84] (sealed document) filed August 30, 2010. The plaintiff filed a response [#192] and the defendant filed a reply [#264]. Based on difficulties encountered by the plaintiff in conducting the deposition of a potentially key witness, I granted [#242] the plaintiff until February 18, 2011, to file a supplement to its response to the motion for summary judgment, based on information obtained in the deposition. Ultimately, Spacecon filed a notice [#265] stating that it had decided to forego the opportunity to file such a supplement. I grant the motion for summary judgment.[2]

---

    [1] "[#87]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

    [2] The issues raised by and inherent to the motion for summary judgment are fully briefed, obviating the necessity for evidentiary hearing or oral argument. Thus, the motion stands submitted on the papers. *Cf.* **FED. R. CIV. P. 56(c)** and **(d)**. *Geear v. Boulder Cmty. Hosp.*, 844 F.2d 764, 766 (10th

## I. JURISDICTION & CONTROLLING LAW

I have jurisdiction over this case under to 28 U.S.C. §§ 1332 (diversity). The plaintiff asserts a claim under the law of the state of Colorado. Colorado law controls the resolution of the substantive issues in this diversity case. ***Erie Railroad Co. v. Tompkins***, 304 U.S. 64, 78 (1938); ***Royal Maccabees Life Insurance Co. v. Choren***, 393 F.3d 1175, 1180 (10th Cir. 2005). Federal law controls procedural issues. ***See, e.g., Sims v. Great American Life Ins. Co.***, 469 F.3d 870, 877 (10th Cir. 2006).

## II. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A dispute is "genuine" if the issue could be resolved in favor of either party. ***Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); ***Farthing v. City of Shawnee***, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it might reasonably affect the outcome of the case. ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); ***Farthing***, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of a genuine fact issue. ***Concrete Works, Inc. v. City & County of Denver***, 36 F.3d 1513, 1517 (10th Cir. 1994), ***cert. denied***, 115 S.Ct. 1315 (1995). Once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not

---

Cir.1988) (holding that hearing requirement for summary judgment motions is satisfied by court's review of documents submitted by parties).

proper. **Concrete Works**, 36 F.3d at 1518. All the evidence must be viewed in the light most favorable to the party opposing the motion. **Simms v. Oklahoma ex rel Department of Mental Health and Substance Abuse Services**, 165 F.3d 1321, 1326 (10th Cir.), **cert. denied**, 120 S.Ct. 53 (1999). However, conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence. **Rice v. United States**, 166 F.3d 1088, 1092 (10th Cir.), **cert. denied**, 120 S.Ct. 334 (1999).

### III.  FACTS

The plaintiff, Spacecon Specialty Contractors, LLC, asserts one claim in this case, a claim for defamation. The claim is based on the pre-screeing of a film made by the defendant, Richard Bensinger. The film is titled "*Looking the Other Way: Benefitting from Misery*" (the Film). The Film is Exhibit One to the Amended Affidavit of Jody Borrelli [#116], which affidavit was filed in support of Bensinger's motion for summary judgment. The film addresses alleged abuses of immigrant construction workers, alleged under payment of such workers, alleged mis-classification of such workers as independent contractors, or so-called 1099 workers, and alleged trafficking of immigrants from Mexico. The film addresses specifically abuses allegedly perpetrated by Leno Asebedo and his company, Leno and Company (Leno), a labor broker that provides laborers to various companies.

It is undisputed that in 2007 and 2008, Spacecon used Leno to provide labor to supplement Spacecon's own employees on three Spacecon projects. In interviews of various workers shown in the Film, the workers describe alleged human trafficking and workplace abuses. Some of the alleged abuses of workers while on the job are tied specifically to Spacecon in these interviews. The Film addresses also the hiring of

undocumented workers, and their claims that they suffer a greater level of mistreatment by Leno and Spacecon because of their undocumented status.

It is undisputed that on August 31, 2007, Spacecon contracted with Leno to provide workers for Spacecon and that some workers provided by Leno were used by Spacecon on a project known as the Residences at Little Nell in Aspen, Colorado. The Film represents explicitly that Spacecon uses Leno to obtain workers for Spacecon projects.  Spacecon terminated its relationship with Leno on May 5, 2008, after Spacecon learned that Leno was not withholding employment taxes for some workers.

It is undisputed that in late 2007 and early 2008, while Spacecon was under contract with Leno, local media reported a story about approximately 65 Mexican citizens who became stranded in Glenwood Springs, Colorado, after being falsely promised employment by Leno and JNS Construction Services, LLC, for work on a project in Colorado for a company known as Midwest.  On January 24, 2008, the Mexican workers brought a lawsuit against Leno, JNS, and Midwest based on their alleged mistreatment.  Spacecon was not named as a party in that suit.  In December 2007, representatives of a union, the Carpenters District Council of Kansas City and Vicinity or its Local Union No. 55 (Union) interviewed some of the stranded Glenwood Springs workers on video tape.  Some of the workers on the video complain about their treatment by Leno, and some of the workers mention Spacecon.  Bensinger did not make this video, but Bensinger used some of this video in the Film.  The Film includes also excerpts of television and newspaper coverage of the workers stranded in Glenwood Springs.

This portion of the film portrays Leno as making misrepresentations to the workers stranded in Glenwood Springs and subjecting those workers to abusive

4

circumstances. Several workers in the film speak of not having any food while stranded, of workers who are not paid or are underpaid, and one of the Glenwood Springs workers speaks of a labor broker proposing to pay him and other workers in cash without payment of employment taxes. These circumstances are connected to Spacecon because some of the Glenwood Springs workers interviewed say they worked on Spacecon projects. Spacecon says only two of the Glenwood Springs workers shown in the Film worked on Spacecon's Little Nell project in Aspen, and those two workers worked on the project only for two days.

The Film shows also public protests against Spacecon's use of labor brokers and the alleged abuses imposed on workers by labor brokers. The Film depicts protests outside of construction projects in downtown Denver, including the Four Seasons Hotel and Spire Denver. Spacecon was a subcontractor on these projects. It is undisputed that Spacecon did not subcontract with Leno to provide labor on these two projects, although there is no evidence that Bensinger was aware of this when the Film was being made or when it was screened.

The general contractor on the Four Seasons Hotel project was Swinerton Builders. The film includes an interview with Kevin Ott, Vice President of Swinerton Builders. Ott is asked about Swinerton's use of Spacecon, and Ott says Spacecon has done much work for Swinerton, and they always have done a good job. Ott acknowledges that he has heard about controversy about Spacecon's alleged use of illegal immigrants but says he has not seen anything documented that shows Spacecon is violating the law in this way. Ott's interview is followed immediately by an interview with Caroline Hankins, who says every Swinerton superintendent knows what goes on with Spacecon. Hankins is represented as having worked for Swinerton as a carpenter

5

for two years.  Hankins says she has seen Spacecon on the job and says Spacecon mistreats many of its workers.  She says Spacecon workers were treated like slaves. Later in the film, Hankins says Spacecon doesn't care about the safety of its workers and does not give them a living wage.

A worker who says he worked for Spacecon says in the film that a Spacecon supervisor named Joe frequently made abusive and degrading comments to Hispanic workers on the job. The film then shows an effort to contact Joe Eiffes, who is represented as a Spacecon supervisor on the Residences at Little Nell project in Aspen. Eiffes approaches the camera, and a man off camera tells Eiffes that the man is a documentary film maker.  The man off camera says he has a question about worker abuse allegations.  Eiffes declines comment.   The man off camera then asks Eiffes what would make him comment, and asks if he can call Eiffes later.  No response from Eiffes is shown.

Following additional descriptions of abuse of Hispanic workers by Spacecon, relayed by workers who say they worked for Spacecon, the film includes a statement by Dave Wilson, who is represented to be an organizer for the Union.  Wilson says that Spacecon can outbid other contractors because Spacecon uses labor brokers and is not paying the taxes, which gives Spacecon an advantage.  That statement is followed by an interview with Bud Stratton, President of E & K Construction in Denver. Stratton says his company cannot bid projects as low as Spacecon because E & K is paying twenty dollars an hour plus insurance and retirement.  The implication is that Spacecon pays its workers less than E & K.

The Film continues with a portrayal of some of the difficult circumstances faced by workers who came to Colorado from Mexico to work, based on promises made by a

6

labor broker, but who were not given the work they were promised. Their inability to earn money to pay to cover expenses for family health care and other needs is portrayed in a sympathetic fashion.

On February 23, 2009, Bensinger wrote to John Banks, Vice-President of Spacecon. Bensinger said he is producing a documentary film that focuses on Spacecon's labor practices, and addresses allegations made by Spacecon employees and others concerning abuse of immigrant labor. *Borelli Affidavit* [#86] (filed under seal) Exhibit 106 (docketed as [#110]), CM/ECF p. 4. Banks responded on March 3, 2009, and offered to answer Bensinger's questions. *Id.*, CM/ECF pp. 5 - 6. Bensinger replied to Banks on March 9, 2009. *Id.*, CM/ECF pp. 7 - 8. Bensinger noted that the film still was in production and encouraged Banks to provide comments for the film. *Id.* Bensinger offered to postpone the scheduled March 12, 2009, pre-release screening of the film if Banks would provide an on screen interview. *Id.* That offer was not accepted, apparently because of Banks' requirement that he be permitted to see the film first. However, Banks did answer several questions from Bensinger in writing, and submitted those answers to Bensinger on March 12, 2009, at about 12:29 p.m. *Id.*, CM/ECF pg. 13. Banks' answers contain various assertions about specific facts as well as some denials of wrongdoing by Spacecon.

On March 12, 2009, the Film was pre-screened once at the Tivoli Center in Denver. About 40 invited guests attended the pre-screening. A poster was created to promote this pre-screening. *Borelli Affidavit* [#86] (filed under seal) Exhibit 3. Bensinger did not create the poser, but Bensinger did not disagree with its content or object to it. The poster says that the Colorado construction industry has a dirty little secret. Human trafficking, tax evasion, insurance fraud, and exploitation of immigrant

7

workers are wreaking havoc on the Colorado construction industry, the poster says. The poster says the film exposes a Colorado construction firm and the devastating effects the firm's actions are having on workers, competitors, taxpayers, and the construction industry as a whole. Spacecon is not named in the text of the poster, but one photo on the poster shows, in the background, a protest sign that includes Spacecon's name. An invitation to the pre-screening also was prepared and distributed to invitees. *Borelli Affidavit* [#86] (filed under seal) Exhibit 4.

Based on the Film, the poster, and the invitation, Spacecon asserts a claim for defamation against Bensinger. Spacecon alleges that Bensinger published false and damaging statements about Spacecon in the Film, the poster, and the invitation. The invitation does not contain any assertions of fact tied to Spacecon. The poster and the Film contain the assertions of fact on which Spacecon's claim is based. Only to the extent the invitation is tied to the poster and the Film, can the invitation possibly be seen as containing assertions of fact about Spacecon.

## IV. STANDARD OF PROOF

Bensinger argues that the Film addresses matters of public concern and that the film arose in the context of a labor dispute. If either of these propositions is true, then the so-called "actual malice" standard of **New York Times v. Sullivan**, 376 U.S. 254 (1964) is applicable to Spacecon's defamation claim. **Walker v. Colorado Springs Sun, Inc.**, 538 P.2d 450, 457 (Colo. 1975), **overruled on otr. grounds by Diversified Management, Inc. v. Denver Post, Inc.**, 653 P.2d 1103, 1107 (Colo.1982) (actual malice standard applicable to defamatory statement involving matter of public or general concern); **Meuser v. Rocky Mtn. Hosp.**, 685 P.2d 776, 778 - 779 (Colo. App. 1984) (defamatory statements made by party to a labor dispute and during a union campaign

actionable only if statements made with actual malice).  The actual malice standard is an enhanced burden of proof.  If the actual malice standard is applicable, then Spacecon must prove by clear and convincing evidence that Bensinger published false statements about Spacecon, and that Bensinger published the statements knowing that they were false or with reckless disregard for their truth or falsity.  **Bowers v. Loveland Pub. Co.**, 773 P.2d 595, 596 (Colo. App.1988).  Under Colorado law, a proposition is proven by clear and convincing evidence if the proposition is proven to be highly probable and not subject to serious or substantial doubt.  CJI-Civ. 4th 3:2 and the concomitant *Notes on Use* and *Source and Authority*.  I conclude that the actual malice standard is applicable to this case.

### A.  Matter of Public Concern

The Colorado appellate courts have not given an explicit definition to the term "matter of public concern" in determining when the actual malice standard is applicable.  **Diversified Management, Inc. v. Denver Post, Inc.**, 653 P.2d 1103, 1107 (Colo. 1982); **Lewis v. McGraw-Hill Broadcasting Co., Inc.**, 832 P.2d 1118, 1121 (Colo. App. 1992).  However, examples of specific issues found by the Colorado courts to constitute matters of public concern are informative.  In **Diversified Management**, the Colorado Supreme Court concluded that a matter of public concern was at issue in a publication involving "alleged widespread and ongoing land-development schemes of questionable propriety" when the public "contained a number of potential buyers who had an abiding interest in the matter."  653 P.2d at 1107.  Speech that is "directed toward policies pertaining to discrimination or which tends or seeks to expose discriminatory practices" touches on a matter of public concern.  **Barrett v. University of Colorado Health Sciences Center**, 851 P.2d 258, 264 (1993) (dicta).  Allegations

that a major retailer had a policy and practice of discriminating against African American customers constitutes a matter of public concern. *Lewis v. McGraw-Hill Broadcasting Co., Inc.*, 832 P.2d 1118, 1121 (Colo. App. 1992). Allegations of reverse discrimination by a public employer also have been found to be a matter of public concern. *Gabel v. Jefferson Co. Sch. Dist. R-1*, 824 P.2d 26, 30 (Colo. App.1991).

The Film addresses topics such as: 1) mis-classification of employees as independent contractors and failure to pay taxes; 2) discriminatory and abusive treatment of Hispanic workers; 3) hiring and abuse of undocumented workers; and 4) human trafficking. These topics generally are the topics of the statements that Spacecon alleges are defamatory. In light of the case law summarized above, I conclude that the Film and the poster address matters of public concern. The fact that Bensinger, as the maker of the Film, might be seen to fall outside of the traditional role of a journalist does not mean that the statements in the film cannot be seen as addressing matters of public concern. *Joe Dickerson & Assoc.*, 34 P.3d 995, 1004 (Colo. 2001). Because the topics addressed in the Film clearly fall into the category of matters of public concern, I do not address the defendant's alternative argument that the actual malice standard is applicable because the Film concerns a labor dispute.

### B.  Standard of Proof

In *Gertz v. Robert Welch, Inc.*, the United States Supreme Court held that "so long as they do not impose liability without fault, the Sates may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U.S. 323, 347 (1974). In *Walker v. Colorado Springs Sun, Inc.*, the Colorado Supreme Court held:

> (W)hen a defamatory statement has been published concerning one who

10

> is not a public official or a public figure, but the matter involved is of public or general concern, the publisher of the statement will be liable to the person defamed if, and only if, he knew the statement to be false or made the statement with reckless disregard for whether it was true or not.

538 P.2d 450, 457 (Colo. 1975), *overruled on otr. grounds by Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1107 (Colo.1982). "In order to honor the commitment to robust debate embodied in the first amendment and to ensure sufficient scope for first amendment values, [the *Walker* court] chose to extend constitutional protection to any discussion involving matters of public concern, irrespective of the notoriety or anonymity of those involved." *Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1106 (Colo.1982).

In *Diversified Management*, the Colorado Supreme Court held that the definition of "reckless disregard" applicable to a defamation claim by one who is not a public official or public figure, but which involves a matter of public concern, is the same as the definition of "reckless disregard" used in *St. Amant v. Thompson*, 390 U.S. 727 (1968). The *St. Amant* Court defined reckless disregard, in this context, as follows:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*Id*. at 731. In this context, a defendant cannot insure a favorable verdict simply by testifying that he published with a belief that the statements were true.

> Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his

11

reports.

***St. Amant***, 390 U.S. at 732 (footnote omitted).

### C.  Conclusion

The alleged defamatory statements at issue in this case address matters of public concern.  As a result, Spacecon can prove its defamation claim only if Spacecon proves by clear and convincing evidence that Bensinger published the allegedly false statements with actual malice.  That means that Spacecon must prove either that Bensinger knew the statements were false or that he made the statements with reckless disregard for the truth or falsity of the statements.

### V.  ANALYSIS

In response to Bensinger's motion for summary judgment, Spacecon argues that the film falsely portrays Spacecon as 1) being engaged in or complicit in human trafficking; 2) contracting with a labor broker, knowing that immigrant workers recruited by the broker would not be paid or would be underpaid, and that the laborers would be paid without the required payment of employment taxes; 3) contracting with a labor broker who sometimes improperly classifies its employees as independent contractors; and 4) taking these actions to lower labor costs so it can submit lower bids to win work on many projects.  In addition, Spacecon contends that Bensinger falsely represents that Spacecon engages in insurance fraud, apparently because workers provided by the labor broker will not be covered by workers' compensation insurance.  Insurance fraud is not mentioned in the Film but the phrase insurance fraud is used in the poster.  Spacecon argues that the Film conveys these messages via the words used by those speaking in the Film and via editing, juxtaposition of film clips, and the repeated use of the name Spacecon in the Film.  Spacecon contends also that the Film portrays

12

Spacecon as routinely mis-classifying its own employees as independent contractors and paying those workers without payment of employment taxes. Having viewed the Film, I conclude that no such portrayal is contained in the Film.

Spacecon argues that the evidence in the record shows that there are genuine issues of material fact concerning Bensinger's actual malice in creating and publishing the film and falsely portraying Spacecon on the issues described above. Spacecon contends that the evidence permits the conclusion that Bensinger in fact entertained serious doubts about the truth of his publication on these issues. Sapceon notes that actual malice may be inferred if an investigation is grossly inadequate. ***Kuhn v. Tribune-Republican Publishing Co.***, 637 P.2d 315, 319 (Colo. 1981). Spacecon argues that Bensinger's investigation to determine the facts was "essentially non-existent." *Response*, p. 36. Bensinger argues that Spacecon cannot establish that Bensinger acted with actual malice because Bensinger believed the statements in the film to be true, and he relied on credible sources in creating the film. Viewing the undisputed facts in the record in the light most favorable to Spacecon, I conclude that Spacecon has not demonstrated a genuine issue of material fact relevant to the issue of Bensinger's actual malice.

The fact that Bensinger did not investigate most or all possible sources of information on the issues addressed in the Film does not demonstrate actual malice. "(M)alice cannot be inferred solely from the combination of the report being false and the failure of defendants in not checking all possible sources of corroboration or verification." ***Lewis v. McGraw-Hill Broadcasting Co.***, 832 P.2d 1118, 1123 (Colo. App. 1992).

Although a complete failure to investigate sources of corroboration of

13

> published statements may be evidence of actual malice, where an adequate investigation is conducted it is unnecessary that the truth of each and every statement be supported by the evidence. Moreover, a reporter, without a high degree of awareness of their probable falsity, may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution . . . .

***Fink v. Combined Communications Corp.***, 679 P.2d 1108, 1111 (Colo. App. 1984) (citations and internal quotation omitted).

The film portrays a variety of people who say they have knowledge of the practices of Leno and/or Spacecon based on their personal experience. Many of those people describe the nature of those practices in negative terms. In general, the descriptions relayed by these people are consistent with each other. That consistency has some tendency to indicate that the statements of these people are credible. Most people portrayed in the Film address these issues from a worker's point of view. That fact, however, does not create a high degree of awareness of probable falsity. Again, absent a high degree of awareness of probable falsity, Bensinger properly could rely on statements made by a source or sources even though they reflect only one side of the story. *Id*. at 1111. Bensinger's failure to corroborate further this information does not demonstrate actual malice. ***Lewis v. McGraw-Hill Broadcasting Co., Inc.***, 832 P.2d 1118, 1124 (Colo. App. 1992). Spacecon has not cited any evidence which demonstrates, by clear and convincing evidence, that Bensinger had a high degree of awareness that the statements in the Film made by workers involved with Leno and Spacecon probably were false.

The Film portrays also an attempt to interview a Spacecon foreman, Joe Eiffes, about the allegations of Spacecon's abuse of workers, but that effort is shown to be fruitless. In addition, the Film portrays Kevin Ott, who says his company often uses

14

Spacecon as a subcontractor and says that Spacecon does good work.  Ott says, in essence, that he has heard some of the allegations against Spacecon but he has not seen them substantiated. These efforts  reflect at least some effort to obtain and portray a countervailing view of Spacecon.  These efforts did not reveal any information that can be seen as creating in Bensinger a high degree of awareness that the workers' statements probably were false.  Further, these efforts tend to show, at least in a small way, an effort to test the truth of the workers' statements about Spacecon.  Such efforts are not consistent with a finding of actual malice.  Of course, after Ott's interview, the Film returns quickly to the worker's point of view with Hankins' interview, in which she dismisses Ott's statements as completely incredible.  As with the other worker interviews, Spacecon has not cited any evidence which demonstrates, by clear and convincing evidence, that Bensinger had a high degree of awareness that Hankins' statements probably were false.

Spacecon argues also that it is portrayed falsely in the Film when people who appear in the film assert that Spacecon uses labor brokers and takes other actions to lower labor costs so it can submit lower bids and win work on many projects.  Dave Wilson, a Union organizer, says in the Film that Spacecon can outbid other contractors because Spacecon uses labor brokers and is not paying the taxes, which gives Spacecon an advantage.  This contention essentially is confirmed by Bud Stratton, President of E & K Construction, a Spacecon competitor.  In its motion for summary judgment, Spacecon cites a variety of evidence indicating that these contentions are not true.  However, there is no evidence in the record that Bensinger perceived these statements as probably false, or that Bensinger had information indicating that these statements probably were false, when the film was screened.  Both Wilson and Stratton

15

were in positions from which they would have some credible knowledge on this issue. Again, Bensinger properly could rely on statements made by a source or sources even though they reflect only one side of the story. *Fink v. Combined Communications Corp.*, 679 P.2d 1108, 1111 (Colo. App. 1984). Bensinger's failure to corroborate further this information does not demonstrate actual malice. *Lewis v. McGraw-Hill Broadcasting Co., Inc.*, 832 P.2d 1118, 1124 (Colo. App. 1992).

Finally, it must be noted that on March 12, 2009, the day the Film was pre-screened, Bensinger received from Banks written answers to several questions posed by Bensinger to Banks. Those answers contain some details about Spacecon's use of Leno and denials of various allegations of wrongdoing by Spacecon. In many ways, Banks' answers present a view of the facts different from that portrayed in the film. Banks' expression of his countervailing view, however, does not demonstrate that Bensinger screened the film with actual malice. Bensinger was not obligated to accept Banks' version of the facts and his denials of wrongdoing as conclusive. *Lewis v. McGraw-Hill Broadcasting Co., Inc.*, 832 P.2d 1118, 1124 (Colo. App. 1992).

Addressing the actual malice standard, Spacecon relies substantially on two Colorado cases, arguing that it has demonstrated genuine issues of material fact concerning Bensinger's actual malice. Spacecon notes that actual malice may be inferred if an investigation is grossly inadequate. *Kuhn v. Tribune-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981). The *Kuhn* court said:

> When one fails to contact and question obvious available sources of corroboration, fabricates specific facts appearing in a story, and writes the story in a manner calculated to invite a factual inference that the newspaper has uncovered governmental corruption and bribery, one knowingly risks the likelihood that the statements and inferences are false and thereby forfeits First Amendment protections.

16

*Id*. at 319. There is no evidence that Bensinger fabricated specific facts about Spacecon which are portrayed in the Film. Rather, Spacecon complains that Bensinger portrays false statements about Spacecon made by others. The holding in **Kuhn** does not alter the analysis applicable to the present case, as detailed in this order, because there is no evidence in the record that Bensinger fabricated facts. Further, Bensinger contacted some sources of corroboration.

Spacecon cites also **Burns v. McGraw-Hill Broadcasting Co.**, 659 P.2d 1351 (Colo. 1983), arguing that reliance on an obviously biased source without further investigation can demonstrate actual malice. In **Burns**, a reporter relied on the statement of an apparently embittered ex-husband about his former wife. Based on the husband's statement, the reporter reported that the former wife had deserted her badly injured husband. The ex-husband's statement, the court concluded, should have been viewed with healthy skepticism and should have been verified before reporting that the wife had deserted her husband. *Id*. at 1361 - 1362.

> The use of a term with obvious pejorative connotations without underlying factual support is evidence of recklessness especially when the reporter has knowledge that the description is in fact untrue. [The reporter] knew that Mrs. Burns had not "deserted" Jack Burns . . . .

*Id*. at 1362.

**Burns** does not alter my analysis of the present case. The **Burns** court concluded that the reporter knew that the description was "in fact untrue." *Id*. There is no such evidence in this case. The reporter in **Burns** relied on one source with a strong and obvious bias. Bensinger relied on reports from a variety of sources with a reasonable level of credibility in creating the Film and publishing statements about Spacecon. The holding in **Burns** does not alter the analysis applicable to the present

17

case, as detailed in this order.

Viewing the evidence in the record in the light most favorable to Spacecon, I conclude that no reasonable fact finder could find that Spacecon has shown, by clear and convincing evidence, that Bensinger published the allegedly false statements in the Film with actual malice. Spacecon has not come forward with evidence that demonstrates, by clear and convincing evidence, that Bensinger knew that any statements in the film were false, or that Bensinger pre-screened the film with a high degree of awareness that any of the statements in the film were false. Therefore, Bensinger is entitled to summary judgment.

## VI.  CONCLUSION AND ORDERS

The alleged defamatory statements at issue in this case address matters of public concern. As a result, Spacecon can prove its defamation claim only if Spacecon proves by clear and convincing evidence that Bensinger made the allegedly false statements with actual malice. That means that Spacecon must prove either that Bensinger knew the statements were false or that he published the statements with reckless disregard for the truth or falsity of the statements. Viewing the evidence in the record in the light most favorable to Spacecon, no reasonable fact finder could find that Spacecon has shown, by clear and convincing evidence, that Bensinger published the allegedly false statements in the Film and in the poster with actual malice. Bensinger is entitled to summary judgment on Spacecon's defamation claim.

**THEREFORE, IT IS ORDERED** as follows:

1. That **Defendant Richard Bensinge's Motion for Summary Judgment** [#87] (public entry), [#84] (sealed document) filed August 30, 2010, is **GRANTED**;

2. That **JUDGMENT SHALL ENTER** in favor of the defendant, Richard

Bensinger, and against the plaintiff, Spacecon Specialty Contractors, LLC;

    3.  That the defendant is **AWARDED** his costs to be taxed by the Clerk of the Court pursuant to FED. R. CIV. P. 54(d)(1) and D.C.COLO.LCivR 54.1;

    4.  That the trial currently set to begin on Monday, March 7, 2011, is **VACATED**;

    5.  That all other pending motions, including [#122, #123, #249, #254, #255, #258, #259, and #302] are **DENIED** as moot; and

    6.  That this case is **DISMISSED**.

Dated March 2, 2011, at Denver, Colorado.

                                  **BY THE COURT:**

*/s/ Robert E. Blackburn*
Robert E. Blackburn
United States District Judge